## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ISAAC JARRETT | } |
| | } |
|     **Plaintiff,** | } |
| | } |
| **v.** | }    **Case No.:  2:14-CV-1598-RDP** |
| | } |
| **RFS JIREH LLC, et al.,** | } |
| | } |
|     **Defendants.** | } |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on the Motion for Summary Judgment filed by Defendants, the City of Birmingham and Officer Kenneth Walton.  (Doc. # 26).  The Motion has been fully briefed.  (Docs. # 26-1, 28, and 29).  For the reasons discussed below, the Motion (Doc. # 26) is due to be granted.

## I.    Summary of Relevant Facts[1]

In his First Amended Complaint, Plaintiff asserts three claims against Defendants that are relevant to this motion: (1) a false arrest claim against Defendant Keith Walton, a former Birmingham Police Officer; (2) a false arrest claim against Defendant City of Birmingham; and (3) a malicious prosecution claim against Walton. On July 13, 2012, Plaintiff Isaac Jarrett was the crew shift manager at the Dunkin Donuts located at 2109 6th Avenue South, Birmingham,

---

[1] If facts are in dispute, they are stated in the manner most favorable to the non-movant, and all reasonable doubts about the facts have been resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only.  They may not be the actual facts that could be established through live testimony at trial.  *See Cox. v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994).  Asserted "facts" that are not facts at all will be disregarded.  *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (conclusory allegations without specific supporting facts have no probative value).

Alabama 35233.  (Doc. # 26-2 p. 25).  Anthony Walzak was the General Manager of the store.

(Doc. # 26-2 p. 5).  Mark Seibert was the District Manager.  (Doc. # 26-2 p. 2).

Before his retirement in 2014, Officer Kenneth Walton was a police officer for the City

of Birmingham.  (Doc. # 26-2 pp. 2, 4).  Chief A.C. Roper is the Police Chief of the City of

Birmingham Police Department.  (Doc. # 26-2 pp. 18, 22).

Plaintiff's duties as crew shift manager of Dunkin Donuts included closing the store,

opening the store, counting down the registers, reconciling the money drawers, counting down

the night deposits and supervising employees.  (Doc. # 26-3 pp. 43-44 and 51).  On July 13,

2012, after the store closed at 8:00 p.m., Plaintiff was in charge of making the cash deposit that

night.  (Doc. # 26-2 p. 25).

Plaintiff was the only person in the store when he counted the store receipts.  (Doc. # 26-

3 pp. 53 and 58).  Some of Plaintiff's actions after the store closed were recorded on the store

video cameras.  (Doc. # 26-2 p. 25).

The store cash receipts from that day ($1,504.42) were to be deposited by Plaintiff, but he

did not make the deposit.  (Doc. # 26-2 p. 25).  Plaintiff told another store manager, Josh Hagen,

and then later Mark Seibert, that he had taken the money to the bank Friday night, July 13, 2012.

(Doc. # 26-2 pp. 25-26).  Plaintiff later changed his story and told Seibert that he did not go to

the bank on July 13, 2012, but instead left the money in the safe.  (Doc. # 26-2 p. 26).

Seibert viewed the store video of Plaintiff counting the July 13, 2012 store receipts. (Doc.

# 26-2 p. 26).[2]   While counting the money, Plaintiff at one point walked out of camera range

with the cash drawer visible in his hands.  Leaving the sight of the camera while counting store

receipts is a violation of store policy.  (Doc. # 26-2 pp. 26-27; Doc. # 26-3 pp. 74, 78-80).

---

[2] A copy of the video recording has been filed with the court and the court has reviewed it.

On July 19, 2012, General Manager Walzak reported the missing Friday night deposit to Birmingham Police Officer Virgil Kinnell. Walzak gave the information he had learned to Officer Kinnell. Walzak explained that Plaintiff was the crew shift manager on July 13, 2012, the date the money went missing. (Doc. # 26-2 p. 5).

Walzak reported to Kinnell that, after the store closed for the day, Plaintiff was in charge of making the cash deposit. (Doc. # 26-2 p. 5). Walzak told Kinnell he had watched the security camera and observed Plaintiff put the money bag and the register drawer in the safe. (Doc. # 26-2 p. 5). Walzak reported that the video showed that Plaintiff then pulled the drawer (and possibly also the money bag) out of the safe and walked out of the office and out of camera range. (Doc. # 26-2 p. 5). Walzak also reported that when Plaintiff returned to the office with the drawer, he appeared to be pushing something into his pocket. (Doc. # 26-2 p. 5). Walzak signed the Birmingham Police Incident/Offense Report and affirmed that he had "read this report and that all information given by me is correct to the best of my knowledge." (Doc. # 26-2 pp. 5, 11).

Seibert, the District Manager, also spoke to Detective Walton about the missing money and Plaintiff's conduct. (Doc. # 26-2 pp. 24-27; Doc. # 26-2 pp. 5-8). Seibert and Walton viewed the video of Plaintiff counting the July 13, 2012 store receipts together. (Doc. # 26-2 pp. 6-8; Doc. # 26-2 p. 24-27). Seibert gave the video recording to Detective Walton. (Doc. # 26-2 p. 6). Seibert also told Walton about Plaintiff changing his story regarding whether he had deposited the funds, and his failure to meet with Siebert to view the video recording. (Doc. # 26-2 pp. 5-7; Doc. # 26-2 pp. 24-27).

Seibert provided Detective Walton with a statement titled "July 13th 2012 Deposit Incident." (Doc. # 26-2 pp. 6, 12-13). Seibert explained that, on July 13, 2012, Plaintiff was the

closing manager.  (Doc. # 26-2 p. 6).  He reported that Plaintiff called Walzak, the General Manager, around 8:00 p.m. on July 13, 2012, to tell him the money was messed up.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Seibert reported that Plaintiff also told Josh Hagen, another store manager, that the money was messed up.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).

Seibert reported to Walton that Plaintiff was also the opening manager the next day, at 5:00 a.m. on Saturday July 14, 2012. (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Seibert reported that Hagen and Plaintiff counted the money in the safe in the morning.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Hagen asked Plaintiff where the deposit was from Friday night.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Plaintiff told Hagen that he had taken it to the bank the night before with a police escort.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).

After the weekend, Seibert went to the bank to get change and pick up the deposit slips from the night drops over the weekend.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Seibert noticed that the bank did not have a deposit from Friday, July 13, 2012.  (Doc. Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Seibert called Plaintiff on July 19, 2012, and asked him if he took the Friday deposit to the bank.  Plaintiff again stated that he had taken the deposit to the bank on Friday night with a police escort.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).

Seibert told Plaintiff that he would investigate the cameras and asked Plaintiff to meet him at the store.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  He also informed Plaintiff that the bank cameras would show whether Plaintiff made a night drop.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Plaintiff informed Seibert that that was fine, and he would meet Siebert at the store. (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Approximately thirty minutes later, Plaintiff called Seibert back and left a voicemail message saying that he had forgotten, and that he had not gone

4

to the bank Friday night, and that he left the money in the safe because the police would not go with him.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).

Plaintiff never met with Seibert to view the video.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).

Seibert informed Detective Walton that the cameras showed the following: At 8:00 p.m., Plaintiff was preparing the deposit in the office with a cash drawer on the desk.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Plaintiff added the money up on the calculator and put it in a deposit bag, but did not fill out a deposit slip.  Instead, he simply put the money in the bag.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Plaintiff folded up the bag with the money in it and placed it in the safe.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Plaintiff then placed the drawer that had been on the desk in the safe with the deposit bag.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).

Plaintiff then took the drawer he just put in the safe out, and walked with it to an area out of range of the camera for approximately 10 seconds.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Plaintiff returned to the office and put the drawer back in the safe.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Seibert informed Detective Walton there was no business reason for Plaintiff to take the drawer out of the office after he started counting the money.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28).  Store policy is to count the money in the office, and while on camera.  (Doc. # 26-2 p. 6; Doc. # 26-2 pp. 24-28; Doc. # 26-3 pp. 74, 78-80).

Based on all of the evidence -- including the statements of the Walzak, Seibert, and Hagen, the change in Plaintiff's story about whether he deposited the money, the video tape, Plaintiff moving out of view of the store camera with the cash drawer in violation of company policy, the image of Plaintiff placing what appeared to be items in his clothing on the video tape, Plaintiff's failure to deposit the money, the fact that the money was missing after Plaintiff's shift,

the additional fact that Plaintiff was the last person seen with the money, and reports that Plaintiff seemed to have a lot of money after this incident -- Detective Walton believed he had probable cause to present the matter of the theft to the Jefferson County District Attorney. (Doc. # 26-2 p. 8).

The District Attorney took the matter to a preliminary hearing at which the Judge found sufficient evidence/probable cause to bind the case over to the Grand Jury. (Doc. # 26-2 p. 8). On July 31, 2012, an affidavit/Warrant was issued for Plaintiff's arrest which was signed by a Magistrate/Judge and Walton.   (Jefferson County District Court Case No. 01-DC-2012-007816.00, Doc. # 2).

In his deposition, Plaintiff admits it was reasonable for Detective Walton to conclude that he was a suspect after determining that he was the last person seen with the store money on video.   (Doc. # 26-3 p. 169). Plaintiff admits he did not file a complaint with the City of Birmingham Internal Affairs Division concerning Detective Walton. (Doc. # 26-3 p. 152).

Finally, there has been no evidence presented in this case indicating that the City of Birmingham has previously had (or currently has) a policy, custom or practice of violating anyone's Constitutional rights including, but not limited to, falsely arresting, falsely imprisoning, and/or maliciously prosecuting persons. (Doc. # 26-2 pp 5-6).  All Birmingham Police Officers receive training concerning how to make probable cause determinations and the constitutional rights enjoyed by citizens.  (Doc. # 26-2 pp. 3 and 5).  Moreover, the Birmingham Police Department investigates claims of wrongdoing by its Officers. (Doc. # 26-2 pp. 5-6).

## II.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the Rule requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial.  *See id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).  As *Anderson v. Liberty Lobby, Inc*. teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial." *Anderson*, 477 U.S. at 252.  "Mere allegations" made by a plaintiff are insufficient.  *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp.2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp.2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc*., 62 F. Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

Plaintiff's First Amended Complaint asserts the following federal claims, pursuant to 42 U.S.C. § 1983, against the moving Defendants: (1) a False Arrest and/or False Imprisonment claim against Walton; (2) a False Arrest and/or False Imprisonment claim against the City of Birmingham, and (3) a Malicious Prosecution claim against Walton.  (Doc. # 22).

### A.    The Contours of Qualified Immunity

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Andujar v. Rodriguez*, 486 F.3d 1199, 1202 (11th Cir. 2007) (internal quotation marks omitted). "An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within

his discretionary authority." *Skop v. City of Atlanta, Georgia*, 485 F.3d 1130, 1136 (11th Cir. 2007). "If the official was acting within the scope of his discretionary authority ... the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." *Id*. at 1136-37.  Here, Plaintiff has not challenged the assertion that Walton was at all times acting within the scope of his discretionary authority.   Moreover, arrests by police officers fall within the discretionary authority function. *See, e.g. Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) ("there can be no doubt that [the officer] was acting in his discretionary authority when he arrested [the plaintiff].")

Therefore, "[t]o overcome qualified immunity, [a] plaintiff must satisfy a two prong test; he must show that: (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). "The threshold inquiry" a court must consider in a qualified immunity analysis is whether Plaintiff has shown a constitutional violation.  *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

### B.    False Arrest and/or False Imprisonment Claim Against Walton

The Fourth Amendment, applicable to the States through the Fourteenth Amendment, guarantees the right to be free from unreasonable searches and seizures. U.S. Cont. Amend. IV; *Brown v. City of Huntsville, Ala*., 608 F.3d 724, 734 (11th Cir. 2010). "It is clearly established that an arrest made without probable cause violates the Fourth Amendment." *Wilkerson v. Seymour*, 736 F.3d 974, 977 (11th Cir. 2013) (quotation marks and citation omitted).  But where

probable cause supports an arrest, it acts as "an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004) (citation omitted).

"Probable cause exists when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Wilkerson*, 736 F.3d at 978 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002) (internal quotation marks omitted)). "An officer is entitled to qualified immunity, however, where the officer had 'arguable probable cause,' that is, where 'reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest' the plaintiffs." *Id*. at 977-78 (quotation marks and citation omitted). "Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." *Brown*, 608 F.3d at 735.

When an arrest warrant has been issued, a police officer is entitled to rely on the magistrate's probable cause determination, as long as that reliance is objectively reasonable. *See United States v. Leon*, 468 U.S. 897, 922 (1984).  To establish probable cause, a police officer has no duty to investigate every possible claim of innocence. *Rankin v. Evans*, 133 F.3d 1425, 1435-36 (11th Cir. 1998).

Plaintiff's argument that Walton did not have probable cause to arrest him is based solely on his contention that the video does not show him putting any money in his pocket.  (Doc. # 28 at 8).  This argument, however, completely ignores the fact that there are numerous other undisputed facts which support a finding of probable cause that Plaintiff took the money. Plaintiff was the last person with the money and he was seen counting it on the video.  He

violated company policy by taking the cash drawer out of camera range once he had started counting it. He was the last person in the store after closing. And he was the first person in the store the next morning for opening. He first reported that he had taken the money to the bank with a police escort. Then, when it was discovered that the bank had no record of the deposit being made on Friday, July 13, 2012, Plaintiff said he "forgot," and admitted that he had not made the deposit. Thereafter, he failed to meet with District Manager Siebert to view the video tape. And, there were reports that Plaintiff seemed to have a lot of money after this incident.

Therefore, even completely discounting the video evidence (which may or may not show Plaintiff placing items in his clothing as he returned to the office with the cash drawer which should never have left the office), there is more than sufficient evidence to support a finding of probable cause, not to mention arguable probable cause. The magistrate judge agreed and, on July 31, 2012, an affidavit/Warrant was issued for Plaintiff's arrest which was signed by a Magistrate/Judge and Walton. (Jefferson County District Court Case No. 01-DC-2012-007816.00, Doc. # 2). Based on the totality of these circumstances, the court does not hesitate to reach the conclusion that Walton had, at the very least, arguable probable cause to arrest Plaintiff; therefore, Walton is protected by qualified immunity. *See Wilkerson*, 736 F.3d at 978.[3]

Because Walton is entitled to qualified immunity, he is entitled to summary judgment on Plaintiff's false arrest and/or false imprisonment claim against him.

### C.   False Arrest and/or False Imprisonment Claim Against the City

Plaintiff next argues that the City of Birmingham is "liable for the unskillfulness of Defendant Walton." (Doc. # 28 at 10).

---

[3] If Plaintiff had asserted his claims under state law, peace officer discretionary function immunity, as provided for in Ala.Code § 6–5–338 would apply. That statute states that peace officers, as defined in the statute, "shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala Code. § 6–5–338(a).

Local government units, such as cities, constitute "persons" subject to suit under Section 1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  However, the Supreme Court "has placed strict limitations on municipal liability under [Section] 1983." *Grech v. Clayton Cty.*, 335 F.3d 1326, 1329 (11th Cir. 2003).

"[A] municipality cannot be held liable under [Section] 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Instead, local governing bodies, such as cities, can be sued under Section 1983 only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690. In other words, to hold a city liable under section 1983, a plaintiff must show that a city employee or policymaker committed the constitutional violation, and did so pursuant to an official municipal policy or custom. *Id*. at 694; *Grech*, 335 F.3d at 1329 n.5 (explaining that the requirement of a policy or custom "is intended to distinguish acts of the municipality from acts of employees of the municipality," thereby clarifying "that municipal liability is limited to action for which the municipality is actually responsible") (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)). It follows, therefore, that Plaintiff must identify an official policy or practice that was the driving force behind the alleged violation of his constitutional rights.

"A plaintiff ... has two methods by which to establish a county's policy: identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county [or state]." *Grech*, 335 F.3d at 1329-30 (citing *Monell*, 436 U.S. at 690-91, 694; *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999); and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)).  Here, Plaintiff has fallen woefully short of making a sufficient showing based upon either requirement.

He has not even attempted to present evidence of a policy, official or unofficial, that led to his alleged unlawful arrest.  And, as discussed above, because Plaintiff was arrested by a police officer based upon (at least) arguable probable cause, he has not established that he was subjected to the repeated acts of a final policy maker or an officer engaging in an unconstitutional practice.[4] Therefore, the City is entitled to summary judgment on Plaintiff's false arrest and/or false imprisonment claim against it.

### D.    Malicious Prosecution Claim Against Walton.

The Eleventh Circuit "has identified malicious prosecution as a violation of the Fourth Amendment and a viable constitutional tort cognizable under § 1983."  *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003); *accord Kjellsen v. Mills*, 517 F.3d 1232, 1237 (11th Cir. 2008). A viable Section 1983 malicious prosecution claim requires a plaintiff to prove two things: (1) the elements of a common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures.  *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004). The common law tort of malicious prosecution has four elements: "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." *Wood*, 323 F.3d at 882. Alabama's elements for malicious prosecution follow the common law elements.  *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 831-32 (Ala. 1999).

As discussed above, an arrest becomes constitutionally unreasonable if done without probable cause.  *Madiwale v. Savaiko*, 117 F.3d 1321, 1324 (11th Cir. 1997).  Therefore, if the arrest was based upon probable cause, a Section 1983 malicious prosecution claim necessarily

---

[4] Nor is there any indication here that Plaintiff had his constitutional rights violated because of any alleged inadequate training offered by the City.

fails. *Kjellsen*, 517 F.3d at 1237. Also, as with a claim of unlawful arrest, an officer raising the defense of qualified immunity must only show arguable probable cause to defeat a malicious prosecution claim. *Grider v. City of Auburn*, 618 F.3d 1240, 1257 n.25 (11th Cir. 2010) (applying the "same 'arguable probable cause' standard in the qualified immunity context" for a § 1983 malicious prosecution claim); *Pruitt v. Gillespie*, 625 Fed.App'x. 374, 377 (11th Cir. 2015) (affirming district court finding that qualified immunity based on arguable probable cause to arrest also defeated malicious prosecution claim).

The court's earlier analysis applies with equal force here. At a minimum, there was arguable probable cause to arrest Plaintiff. Walton is protected by qualified immunity and Plaintiff's malicious prosecution claim fails as a matter of law. *See Wilkerson*, 736 F.3d at 978; *Grider*, 618 F.3d at 1257 n.25; *Pruitt*, 625 Fed.App'x. at 377.

IV.    **Conclusion**

For the foregoing reasons, the court concludes that there are no genuine issues of material fact and Defendants are entitled to judgment as a matter of law on all of the claims set forth in Plaintiff's Complaint.  A separate order will be entered.

**DONE** and **ORDERED** this June 15, 2016.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE